[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff in this action, acting in a pro se capacity, brings this action against Norman E. Whitney and his son Peter J. Whitney. The defendants also appear pro se.
In response to a Request to Revise Complaint, the plaintiff filed a document entitled "Plaintiff Complaint" dated July 9, 1999 which sets forth her allegations against the defendant Norman Whitney. There are no claims alleged against Peter Whitney, who is Norman Whitney's son, nor was there any evidence that he was involved in the dispute. The Court will hereafter refer to Norman E. Whitney as the defendant.
Factual Background
In 1994, Ms. Mezrioui moved into a single family home situated on approximately seven acres of land in the town of Andover, Connecticut. This had been Mr. Whitney's residence and he was planning on moving to Florida. Ms. Mezrioui was a "Section 8" client which meant that she got rental assistance through the "Section 8" program. The program paid the landlord a set portion of the monthly rent and the tenant was obligated to pay the balance.
When Ms. Mezrioui moved into the house it was in good condition (testimony of Nilsa Rivera, a friend of the plaintiff).
Whether or not there was a written lease between the parties is uncertain. No lease was introduced at trial and no lease is on file at the Manchester Housing Authority which presently manages the "Section 8" program in this area (including Andover). (Testimony of Sally Bergner).
In 1994, the "Section 8" program was managed by the Community Renewal Team of Greater Hartford (CRT). In December of 2000 supervision of the "Section 8" program was transferred to J. Damelia Associates (Damelia) in Waterbury. However, a great many cases were transferred CT Page 3080 without files or documentation and a management decision was made to continue making payments to landlords until such time as the files could be reconstituted. The Mezrioui matter was one such file and rental payments to Mr. Whitney continued through March 2002 when the "Section 8" payments were stopped. The "Section 8" program paid Mr. Whitney $494 per month. Damelia in turn had transferred supervision of Ms. Mezrioui's account to the Manchester Housing Authority as a local agency although Damelia remained in overall charge. Even though the Housing Authority continued to pay Mr. Whitney through March 2002, CRT had cancelled the housing assistance payment contract effective December 1, 1999 (Exhibit HH), but because of the disarray with their files the payments continued even though the plaintiff had been terminated as a client.
Throughout all this period Ms. Mezrioui continued to live on the property and remains there at this time.
In June 1999 she commenced this action in which she seeks damages of $137,024.
Discussion of Claims
For the sake of clarity the Court will discuss the plaintiff's claims in the order they appear in the revised complaint (Entry No. 102)
A. Paragraph 2: The plaintiff alleges that she and Mr. Whitney had an oral agreement to sell her the property and he reneged or breached that contract. Connecticut General Statutes § 52-550 requires that any agreement for the sale of real property be in writing in order to maintain a civil action for breach of contract. In addition to a lack of evidence of such a contract this claim is barred by the Statute of Frauds.
B. Paragraph 3:A. The plaintiff claims water to the house was unfit and that it came from a pond, not a well. This allegation was disproved by the credible evidence from John Valente the sanitarian of the town of Andover since 1988. The plaintiff complained to his office in 1996 about the quality of the water. His investigation revealed the water was from a drilled well (not the pond), that the water was tested and found potable, that while the water contained iron it was drinkable. He recommended that a water softener would help reduce the iron (but it was not a requirement). The plaintiff spoke to Mr. Whitney about it and Mr. Whitney agreed, as an accommodation, to split the cost of installing a water softener ($210 each) and to split the monthly service charge with the plaintiff deducting her half from her portion of the rent due the landlord. The plaintiff subsequently cancelled the water softening CT Page 3081 service with Culligan Water Conditioning apparently because she could not afford to make her share of the agreed payments. (Exhibit V).
Her claim that she made the agreement with the landlord under duress was not proven by any credible evidence. In any event the water was potable when tested and is being used by the plaintiff even at this time.
Paragraph 4: The plaintiff claims Mr. Whitney did not maintain the yard, that she had to replace a section of plumbing pipe, two electric outlets were uncovered, that he failed to exterminate mice, that there were insufficient electrical outlets in some rooms and he failed to keep a smoke detector in working order, and that she replaced a hot water heater in the basement at her expense.
A landlord's responsibilities are set forth in Connecticut General Statutes § 47a-7. He is required generally to keep the premises in a fit and habitable condition.
Connecticut General Statutes § 47a-13 provides for a tenant's remedies if the landlord fails to supply essential services to a tenant. Section 47a-13 (c) further provides that a tenant's rights under this section do not arise (1) until the tenant has given reasonable written or oral notice to the landlord.
There was no evidence in this case that the plaintiff notified Mr. Whitney, as the statute requires, of the defects alleged in order to give him an opportunity to make any necessary repairs.
With respect to her claim of bugs and mice infestation, not only was there lack of evidence of notification, the plaintiff testified that she probably brought roaches into the house with boxes from a Stop and Shop store and that mice rested in the boxes she had been storing items of personal property. Also, the evidence showed that when apprised of certain defects the landlord made arrangements to repair them. Specifically, when the Manchester Housing Authority rebuilt its file in this case it invited both the landlord and tenant to reapply for "Section 8" eligibility. Although the testimony was that this particular house would not have been approved in the final analysis because it was too big and expensive, as a preliminary matter they caused an inspection of the house to be done. (Exhibit R). That inspection listed the following needed repairs: living room ceiling water damage, ground fault interrupters needed in kitchen and bathroom, bathroom floor tile, smoke detectors need batteries, animal droppings found, gutters need cleaning and repair, some exterior siding missing and poor air quality from animals. CT Page 3082
The landlord arranged with a contractor, Gary Vilchinskas, to make the repairs indicated. The repairs were completed at a cost of $4200 and the plaintiff expressed her satisfaction to Mr. Vilchinskas, telling him how nice the place looked. It is noted that the poor air quality cited was due to the plaintiff's several dogs and is not attributable to the landlord.
The plaintiff's claims as outlined in paragraph 4 are denied.
Page 2: The Court did not allow the plaintiff to represent her son or to make claims on his behalf. He had been a tenant of Mr. Whitney's prior to the plaintiff, however, he is not a party plaintiff in this action and was not available to testify. (A video tape he made was not admitted into evidence).
Paragraph 5: The plaintiff claimed she repaired the fireplace, insulated the basement and replaced three windows.
The parties had an agreement (Exhibit Q) concerning fireplace repairs with a credit from the plaintiff's rent. There was no credible evidence as to the replacing of windows or insulation and no evidence of the costs to do so. This claim is denied. Similarly, the plaintiff's claim for $700 to clean the house inside and out (Exhibit P) is not substantiated by any credible evidence or that the landlord was given notice the cleaning was necessary.
Lastly the plaintiff's claim that the defendant harassed her causing her emotional distress is without merit. The elements of Intentional Infliction of Emotional Distress (which is the apparent cause of action) require extreme and outrageous behavior and that the behavior was intended to cause such distress or that the defendant knew or should have known the emotional distress would likely occur.
To prevail on a claim of negligent infliction of emotional distress, the plaintiff must demonstrate that the defendant should have realized that his conduct was an unreasonable risk of causing emotional distress and that such distress, if it were caused, might result in bodily harm or illness.
Under either cause of action the plaintiff cannot prevail. The bases of her claim is that the defendant advised the housing authority he was terminating the "Section 8" arrangement, and that he brought two unsuccessful summary process actions for non-payment of rent in 1998 and 1999. Utilizing legal processes is not tantamount to harassment and it was not foreseeable that the defendant in so doing created an CT Page 3083unreasonable risk (emphasis added) of emotional distress. Nor could such action be deemed extreme and outrageous. The evidence presented in this trial was that neither the plaintiff nor the Housing Authority have made any rental payment for years.
For these reasons, judgment shall enter for the defendants.
Klaczak, JTR CT Page 3084